COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00480-CV

 

 


 
 
 In the Interest of A.L.W.
 and M.M.P., the Children
  
  
  
  
  
  
 
 
 §
  
 §
  
 §
  
 §
  
  
 
 
 From the 393rd District Court
  
 of
 Denton County (2010-61410-393)
  
 November
 8, 2012
  
 Opinion by Justice Gabriel
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s judgment. 
It is ordered that the judgment of the trial court is affirmed. 

 

SECOND DISTRICT
COURT OF APPEALS 

 

 

 

By_________________________________

    Justice Lee Gabriel



 




 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00480-CV


 
 
 In the Interest of A.L.W. and
 M.M.P., the Children
 
 
  
 
 
  
 
 
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 


----------

FROM THE
393rd District Court OF Denton
COUNTY

----------

MEMORANDUM
OPINION[1]

----------

Appellants
D.W.P. (Father) and E.W. (Mother) appeal the trial court’s judgment terminating
their parental rights to their child, M.M.P. (Maria).[2]  Mother also appeals the termination of her
parental rights to her child A.L.W. (Abigail). 
Appellant D.P. (Grandmother) appeals the trial court’s judgment granting
managing conservatorship of Maria to A.M. (Ann Maroney) and B.M. (Bob
Maroney).  We affirm. 

Background Facts

Mother
gave birth to Abigail in October 2006, during her marriage to Z.W.
(Ex-Husband).  They later divorced, and
Mother began dating Father.  The
Department of Family and Protective Services (DFPS or the Department) was first
called to Mother and Father’s apartment in February 2009 for concerns over a
domestic dispute.  Police found marijuana
in the parents’ bathroom, which Mother said was hers.  Mother was arrested for possession of the
marijuana.  DFPS closed its case because
Mother sought treatment for anxiety and bipolar disorder from Denton County
Mental Health and Mental Retardation (MHMR).

Mother
eventually became pregnant with Maria. 
During her pregnancy with Maria, Mother’s parents divorced, and Mother
moved in with her aunt and uncle, the Maroneys. 
After a few weeks, Mother left the Maroneys and moved in with Father and
his parents.  Mother gave birth to Maria
in December 2009.

In
July 2010, DFPS was notified over concerns of drug use by both parents.[3]  Mother and Father were asked to take drug
tests, which they refused.  Mother then
moved to Nacogdoches, and Father followed shortly thereafter.  In October 2010, after Mother tested positive
for ecstasy, DFPS took custody of the children and placed Abigail with her
father, Ex-Husband, and Maria with Father’s parents, Grandmother and
Grandfather.  The day after removal,
Father tested positive for cocaine, marijuana, and methamphetamine.

The
parents then moved to Austin, where Father had found work.  While living in Austin, the parents were
arrested for public intoxication and possession of drug paraphernalia.  In March 2011, Mother and Father moved into
an RV rented from Father’s parents in Denton. 
After a few weeks, they moved into a house in Denton also rented from
Father’s parents.

Sometime
around April 2011, Grandmother and Grandfather took Maria to Nacogdoches to see
Mother’s grandmother.  Mother and Father
followed in their own car to empty a storage unit.  The parents met up with Grandmother and
Grandfather at Mother’s grandmother’s apartment.  This visit had been specifically denied by
DFPS.  When the Department found out
about the Nacogdoches trip, they moved Maria to the Maroneys.

In
March 2011, a man matching Father’s description stole clothes from a Buckle
store in Vista Ridge Mall.  A witness got
the license plate of the car the man left in, which matched Grandmother’s
car.  In June 2011, Mother and Father
were detained at a Wal-Mart because they switched tags on some bicycles.  They were cited for trespass, but the police
officers arrested Father for the Buckle theft.

DFPS
moved for termination because the parents had not made sufficient progress on
their service plan.  Both Grandmother and
the Maroneys intervened, requesting managing conservatorship.  A jury found by clear and convincing evidence
that Mother and Father had engaged in conduct or had knowingly placed Maria
with persons who engaged in conduct that endangered her physical or emotional
well-being; that Mother and Father had knowingly placed or knowingly allowed
Maria to remain in conditions or surroundings that endangered her physical or
emotional well-being; that Mother and Father had failed to comply with the
provisions of a court order that specifically established the actions necessary
for them to obtain Maria’s return; that Mother and Father had used a controlled
substance in a manner that endangered Maria’s health or safety and had failed
to complete a court-ordered substance abuse treatment program, or after
completion of such a program, had continued to abuse a controlled substance;
and that termination of Mother and Father’s parental rights to Maria was in her
best interest.  The jury also found that
Mother had engaged in conduct or had knowingly placed Abigail with persons who
engaged in conduct that endangered Abigail’s physical or emotional well-being;
that Mother had knowingly placed or had knowingly allowed Abigail to remain in
conditions or surroundings that endangered her physical or emotional
well-being; that Mother had failed to comply with the provisions of a court
order that specifically established the actions necessary for her to obtain
Abigail’s return; that Mother had used a controlled substance in a manner that
endangered Abigail’s health or safety and had failed to complete a
court-ordered substance abuse treatment program, or after completion of such a
program, had continued to abuse a controlled substance; and that termination of
Mother’s parental rights to Abigail was in her best interest.  The jury found that the Maroneys should be
awarded managing conservatorship of Maria.[4]  Mother, Father, and Grandmother filed this
appeal.

Standard of Review

A
parent’s rights to “the companionship, care, custody, and management” of his or
her children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455
U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d
534, 547 (Tex. 2003).  “While parental rights are of constitutional
magnitude, they are not absolute.  Just
as it is imperative for courts to recognize the constitutional underpinnings of
the parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.”  In re C.H., 89 S.W.3d 17, 26 (Tex. 2002). 
In a termination case, the State seeks not just to
limit parental rights but to erase them permanently—to divest the parent and
child of all legal rights, privileges, duties, and powers normally existing
between them, except for the child’s right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (West
2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings
and strictly construe involuntary termination statutes in favor of the
parent.  Holick, 685 S.W.2d at
20–21; In re R.R., 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no
pet.).

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex.
Fam. Code Ann. § 161.001 (West Supp. 2012); In re J.L., 163 S.W.3d
79, 84 (Tex. 2005).  Both elements must
be established; termination may not be based solely on the best interest of the
child as determined by the trier of fact. 
Tex. Dep’t of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987); In re D.T., 34 S.W.3d 625, 629
(Tex. App.—Fort Worth 2000, pet. denied).

Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code Ann. § 161.001; see also § 161.206(a).  Evidence is clear and convincing if it “will
produce in the mind of the trier of fact a firm belief or conviction as to the
truth of the allegations sought to be established.”  Id. § 101.007 (West 2008).  Due process demands this heightened standard
because termination results in permanent, irrevocable changes for the parent
and child.  In re J.F.C., 96
S.W.3d 256, 263 (Tex. 2002); see In re J.A.J., 243 S.W.3d 611,
616 (Tex. 2007) (contrasting standards for termination and modification).




Discussion

1. Intervention by Grandmother

In
her first issue, Grandmother argues that the trial court erred by failing to
rule on her petition to intervene. 
Grandmother filed a “Petition in Intervention for Conservatorship and
Request for Appointment as Temporary Possessory Conservator.”  DFPS filed a motion to strike the intervention
and requested that the trial court dismiss Grandmother as a party to the
suit.  After a hearing on the motion to
strike on June 8, 2011, the trial court signed an order that stated,

[T]he Court at this
time makes no finding regarding the intervention, takes the same under
advisement, and reserves the determination of this issue to such time as the
court determines a final determination should take place.

 

. . . [T]he Court
grants the party seeking intervention, [Grandmother], the right to appear in
the Court through counsel in this cause, the right to receive notice of all
proceedings, the right to conduct reasonable discovery, and the obligation to
respond to discovery, the same as a party to this action, without specifically
finding that [Grandmother] is a party.

 

Grandmother
argues that the trial court erred by failing to find that she had standing to
intervene.  However, Grandmother actively
participated at trial through her counsel, introduced evidence, called
witnesses, and had the opportunity to cross-examine all other witnesses.  She was listed in the jury charge for the
jury to consider her as the possible managing conservator of Maria.  Grandmother has thus failed to demonstrate
what harm she suffered by the trial court’s refusal to make a finding regarding
her motion for intervention.  See Tex. R. App. P. 44.1(a) (stating
that no judgment may be reversed on appeal unless the error complained of
probably caused the rendition of an improper judgment or probably prevented the
appellant from properly presenting her appeal). 
We therefore overrule Grandmother’s first issue.

2. Intervention by the Maroneys

In
her second issue, Grandmother argues that the trial court erred by granting the
Maroneys’ petition to intervene.  We
review a trial court’s order granting or denying a motion to strike an
intervention under an abuse of discretion standard.  In re
A.M., 60 S.W.3d 166, 168 (Tex. App.—Houston [1st Dist.] 2001, no pet.)
(citing Mendez v. Brewer, 626 S.W.2d
498, 499 (Tex. 1982)).

To
determine whether a trial court abused its discretion, we must decide whether
the trial court acted without reference to any guiding rules or principles; in
other words, we must decide whether the act was arbitrary or unreasonable.  Low v. Henry, 221 S.W.3d 609,
614 (Tex. 2007); Cire v. Cummings, 134 S.W.3d 835, 838–39 (Tex.
2004).  An appellate court cannot
conclude that a trial court abused its discretion merely because the appellate
court would have ruled differently in the same circumstances.  E.I. du Pont de Nemours & Co. v.
Robinson, 923 S.W.2d 549, 558 (Tex. 1995); see also Low, 221 S.W.3d
at 620.  An abuse of discretion does not
occur when the trial court bases its decision on conflicting evidence and some
evidence of substantive and probative character supports its decision.  Unifund CCR Partners v. Villa, 299 S.W.3d 92, 97 (Tex. 2009); Butnaru
v. Ford Motor Co., 84 S.W.3d 198, 211 (Tex. 2002).

The
Maroneys filed a petition in intervention on June 17, 2011.  Father filed a motion to strike the Maroneys’
petition.  A hearing was held on Father’s
motion and the trial court denied the motion to strike intervention.

Section
102.004(b) of the family codes states, 

[T]he court may grant
a grandparent or other person deemed by the court to have had substantial past
contact with the child leave to intervene in a pending suit filed by a person
authorized to do so under this subchapter if there is satisfactory proof to the
court that appointment of a parent as a sole managing conservator or both
parents as joint managing conservators would significantly impair the child’s
physical health or emotional development.

 

Tex.
Fam. Code Ann. § 102.004(b) (West 2008). 
Grandmother argues that the Maroneys did not have substantial past
contact with Maria.[5]  “Substantial past contact” is not statutorily
defined, and case law has not delineated any parameters for the amount of
contact an intervenor is required to have had with the child.  However, courts have considered where the
child has resided in their analysis of substantial contact.  See,
e.g., In re N.L.G., 238 S.W.3d 828, 831 (Tex. App.—Fort Worth 2007, no
pet.) (upholding intervention by foster parents when child had lived with them
for about fourteen months); A.M., 60
S.W.3d at 169 (upholding trial court’s implied finding that intervenors had
substantial contact with the child when they had fostered the child for seven
months at the time they filed their plea in intervention and had fostered the
child for another seven months by the time their standing to intervene was
challenged).

Maria
was placed with the Maroneys on May 2, 2011. 
At the time the Maroneys intervened, Maria had been living in their
house fulltime for almost seven weeks. 
While the length of time is shorter than in many cases, it is not so
short that it could not be seen as substantial. 
Cf. In re C.M.C., 192 S.W.3d 866, 872 (Tex. App.—Texarkana 2006, no
pet.) (holding that intervenors did not have substantial past contact with the
children when they had only met the older child twice and had never met the
younger child).

Since
the Texas Legislature passed section 102.004(b) of the family code in 1995,
there has been a new, more relaxed standard for determining standing based on
substantial past conduct in a termination proceeding such as this.  See
Tex. Fam. Code Ann. § 102.004(b); In
re N.L.G., 238 S.W.3d at 831.  We
believe section 102.004(b) gives the trial judge the discretion to determine
whether those who undertake the day-to-day supervision of a child, her
activities, and most of the functions ordinarily associated with legal custody
have substantial past contact to confer standing to intervene.  Sound policy supports this relaxed standard
when managing conservatorship is already an issue in the case.  See In
re M.T., 21 S.W.3d 925, 927 (Tex. App.—Beaumont 2000, no pet.) (“Sound
policy underlies the Legislature’s creation of a relaxed standing rule subject
to court discretion for intervention in an existing suit.”).  The child’s best interest is the predominant
issue before the court, and allowing the intervention of parties who wish to
adopt the child may enhance the trial court’s ability to adjudicate that
issue.  See N.L.G., 238 S.W.3d at 830. 
We therefore cannot say that the trial court’s decision was so arbitrary
or so unreasonable so as to constitute an abuse of its discretion.  See
In re Hidalgo, 938 S.W.2d 492, 495
(Tex. App.—Texarkana 1996, no writ) (upholding stepgrandmother’s intervention
when child had lived with stepgrandmother for just over two months and she “had
been close, both emotionally and physically, to the child since her
birth”).  We overrule Grandmother’s
second issue.

3. Failure to sever issues

In
her third issue, Grandmother argues that the trial court erred by denying
motions to sever issues in this case.           Both Mother and Father filed a motion
to sever issues.  The record contains an
order stating that a hearing was held and the trial court denied Father’s
motion.  Grandmother claims that she
joined in the motions “on the date of the hearing,” but there is no written
motion in the record, and we received no reporter’s record of the hearing.

The
trial court has broad discretion in determining whether to sever a claim.  Guaranty
Fed. Sav. Bank v. Horseshoe Operating Co., 793 S.W.2d 652, 658 (Tex.
1990).  A claim is severable if
(1) the controversy involves more than one cause of action, (2) the severed claim is one that would be the proper subject of a lawsuit if
independently asserted, and (3) the severed claim is
not so interwoven with the remaining action that they involve the same facts
and issues.  Id.

Grandmother
argues that the parents should have had separate trials so that they would not
“be tried on the mistakes or acts of the other parent.”  Grandmother claims that “there was prejudice
because of the very nature of someone who does drugs” and that Father’s
criminal history “placed him at odds with the other parties.”  One of DFPS’s bases for termination of Mother
and Father’s parental rights was that they had knowingly placed or knowingly
allowed the children to remain in conditions or surroundings that endangered
their physical or emotional well-being and that they had engaged in conduct or
knowingly placed the children with persons who engaged in conduct that
endangered their physical or emotional well-being.  DFPS presented evidence that both parents
were aware of the other’s drug use, and even used drugs together, yet each
continued to allow the other parent to care for the children.  There was also evidence that Mother was aware
of Father’s criminal history and may have engaged in criminal conduct with
him.  The trial court could have
reasonably concluded that evidence of one parent’s conduct was relevant to the
issue of whether the other parent had knowingly placed the children with
persons who engaged in conduct that endangered their physical or emotional
well-being as well as to the issue of the children’s welfare with both parents
and that these issues were sufficiently interwoven to justify a joint trial. See Holmes v. Tex. Dep’t of Protective &
Regulatory Servs., No. 03-01-00325-CV, 2002 WL 1727384, at *2 (Tex.
App.—Austin Jul. 26, 2002, pet. denied) (not designated for publication)
(upholding trial court’s refusal to sever when one parent’s actions were
relevant to the grounds for terminating the other parent’s parental rights); In re Caballero, 53 S.W.3d 391, 396–97
(Tex. App.—Amarillo 2001, pet. denied) (holding that the trial court did not
abuse its discretion by denying severance when questions regarding the child’s
welfare under care of both parents were sufficiently intertwined).  We cannot say that the trial court abused its
discretion in refusing to sever the issues, and we overrule Grandmother’s third
issue.

4. 
Failure to grant a mistrial

In
Grandmother’s fourth issue, she argues that the trial court erred by not
granting a mistrial after it failed to strike testimony regarding photographs
that she alleges were improperly admitted. 
We review the denial of a motion for a mistrial by an abuse of
discretion standard. See Schlafly v.
Schlafly, 33 S.W.3d 863, 868 (Tex. App.—Houston [14th Dist.] 2000, pet.
denied).

“The
admissibility of a photograph is conditioned upon its identification by a
witness as an accurate portrayal of the facts, and on verification by that
witness or a person with knowledge that the photograph is a correct
representation of such facts.”  Davidson
v. Great Nat’l Life Ins. Co., 737
S.W.2d 312, 314–15 (Tex. 1987).  “The
predicate for admissibility need not be laid by the photographer, the person
photographed, or even a person who was present when the photograph was taken,
but any witness who observed the object or scene depicted in the photograph may
lay the predicate.”  Kessler v.
Fanning, 953 S.W.2d
515, 522 (Tex. App.—Fort Worth 1997, no pet.). 
All that is necessary is testimony from a witness with personal
knowledge that the photographs accurately depict what they are “claimed to be.”
 Tex. R. Evid. 901(b)(1); Kessler, 953 S.W.2d at 522.

During
trial, Mother was questioned about the trip to Nacogdoches.  Mother testified that when Grandmother and
Maria were leaving Mother’s grandmother’s apartment, Father walked out with his
parents and Maria while Mother remained upstairs.  The Maroneys showed Mother a picture of
Father, Grandfather, and Grandmother, who was carrying Maria, walking down the
front steps of a building.  The Maroneys
asked, “After looking at those pictures, ma’am, does that accurately depict the
scene in Nacogdoches on that date and time that you are referring to?”  Mother responded, “Yeah.  I was upstairs visiting and they are
leaving.”  Grandmother objected, and the
trial court struck everything after “Yeah.” 
The Maroneys then offered the photographs into evidence.  Grandmother objected, and the trial court
overruled the objection and admitted the photographs.

Later,
outside of the jury’s presence, Grandmother cross-examined Mother on her
knowledge of the photographs.  Mother
testified that she was not in the pictures, was not present when the pictures
were taken, and had no personal knowledge that they accurately depicted what
they purported to represent.  The trial
court said,

What we got here is a
disputed issue of fact.  At one point the
witness says, yes, that it is an accurate depiction, which is the only
requirement you have to do.  They don’t
have to take the picture.  They don't
even have to be present when the picture is made.  All[] they have to say is that it is an
accurate depiction.  And but on
redirect—or [Grandmother] makes a telling cross-examination, but that’s what it
is at this point.  We have a witness that
contradicts herself.  The jury can decide
which one is true.  They stand admitted.

 

Grandmother
moved for a mistrial, which was denied.

The
trial court did not err in admitting the photographs.  Mother testified she was in the apartment
building at that time and had seen Father, Grandmother, Grandfather, and Maria
leave at the same time.  She testified
that the photograph accurately depicted the departure.  Further, Father testified that he walked out
of the building with his parents and Maria.[6]  Grandmother also testified that the
photographs showed them leaving the apartment building and that she was
“getting [Maria] away from [Father].”  The
photographs showed nothing more than what was established through Father and
Grandmother’s testimony.  Thus,
Grandmother did not demonstrate that the court’s ruling was erroneous.  See
Roberson v. Collins, 221 S.W.3d 239,
243 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (upholding court’s ruling
admitting evidence because the ruling was not erroneous and the appellant did
not show that the ruling probably caused the rendition of an improper
judgment).  Because the photographs were
properly admitted, the trial court did not abuse its discretion by denying
Grandmother’s motion for mistrial based on the photographs’ admission.  We overrule Grandmother’s fourth issue.

5. Hearsay

In
her fifth issue, Grandmother argues that the trial court erred in admitting
evidence which contained hearsay.  Ashton
Moore, a conservatorship specialist for DFPS, had been assigned to Mother and
Father’s DFPS case in March 2011.  During
her testimony, DFPS offered Petitioner's Exhibit 45, the parents’ Permanency
Plan and Progress Report from January 2011. 
Moore was questioned,

Q. And is that a
stamped copy of a permanency plan and permanency progress report?

 

A. Yes.

 

Q. And was that part
of your case file?

 

A. It was.

 

Q. And do you keep
that in the normal course of business with—as a caseworker on that case?

 

A. Yes.

 

Grandmother
objected first as to hearsay, and the trial court overruled her objection.  DFPS clarified that they were offering the
exhibit as a business record. 
Grandmother further questioned Moore,

          Q. Do you have personal knowledge as
to who prepared that document?

 

          A. I recognize the signatures.

 

          Q. Do you know whether those people
had knowledge of the actual facts that are reported in that?

 

          A. They would have.

 

          Q. Is that your opinion, or is that
something you actually know?

 

          A. That would be something I know
based on my experience with [DFPS].

 

.
. . .   

 

          Q. Were the notations in that document
made close in time to the time the information was provided?

 

          A. It would have been, yes.

 

          Q. Is all that information provided by
employees or people under the control of your department?

 

          A. No. 
It would have been provided by—it would have been compiled from reports
we received from service providers and our experience with the family.

 

          Q. So it would have been from outside
providers that are not under the control of the Department?

 

          A. It would have been from everybody.

 

Grandmother
then objected that the file was an improper business record.  The trial court overruled the objection,
stating, “It’s similar to a business record.”

On
appeal, Grandmother argues that the trial court’s comment that the file was
“similar to a business record” means that the file did not fall within the
business records exception to hearsay. 
The business records exception has four requirements: (1) that the
records were made and kept in the course of a regularly conducted business
activity, (2) that it was the regular practice of the business activity to
make the records, (3) that the records were made at or near the time of
the event that they record, and (4) that the records were made by a person
with knowledge who was acting in the regular course of business.  See In
re E.A.K., 192 S.W.3d 133, 141 (Tex. App.—Houston [14th Dist.] 2006, pet.
denied).  Moore testified that the
permanency plan was made and kept in the regular course of her business, that
the records were made near the time of the events recorded, and that the
records were compiled by a person with knowledge who was acting in the regular
course of business.  The permanency plan
was thus properly admitted under the business records exception.  Further, beyond the conclusory statement that
the admission of the documents was “not without harm,” Grandmother fails to
demonstrate how she was harmed by the admission of the file.  See In
re C.J., No. 04-06-00132-CV, 2006 WL 1751211, at *2 (Tex. App.—San Antonio
June 28, 2006, no pet.) (mem. op.) (refusing to find error in the admission of
the State’s business records when the father did not explain how the admission
of three exhibits resulted in harm in view of the evidence that was
presented).  We overrule Grandmother’s fifth
issue.

6. 
Incomplete record

In
her sixth issue, Grandmother argues that the failure of the court reporter to
provide a complete record is a reversible error.  Grandmother claims that the lack of the
reporter’s record for the hearing on DFPS’s motion to strike Grandmother as an
intervenor impeded her ability to present her first issue on appeal.  The order on DFPS’s motion states that a
record of the hearing was made, but this court did not receive a record of that
hearing.  However, as we noted above, the
trial court’s order states that the trial court made “no finding regarding the
intervention” at that hearing and “reserve[d] the determination of this issue
to such time as the court determine[d] a final determination should take
place.”  Grandmother also argues that the
reporter’s record of the hearing on the Maroneys’ intervention was necessary
for her second issue.  The order denying
Father’s motion to strike the Maroneys does not recite that a record was made.

An
appellant is entitled to a new trial under the rules of appellate procedure if
she has timely requested a reporter’s record, but through no fault of her own,
a significant portion of the recording has been lost or destroyed, and the lost
or destroyed portion is necessary to the appeal’s resolution and cannot be
replaced.  Tex. R. App. P. 34.6(f).  Grandmother timely requested the reporter’s
record.  But there is no evidence that
the record has been lost or destroyed. 
There is also no indication that a record was made of any hearing that
may have taken place on Father’s motion to strike the intervention of the
Maroneys.  Grandmother makes a slight
reference to this in her sixth issue with no citation to support her position
that a record ever existed or that it was lost or stolen.

But
even assuming that the record is lost or destroyed, Grandmother has not
demonstrated that the missing portion is necessary to the resolution of her
appeal.  Regarding Grandmother’s
intervention, the trial court made no findings during or after the hearing, and
Grandmother fully participated at trial. 
As to the Maroneys’ intervention, we conclude that a review of a
transcript that may never have existed was not necessary to our determination
that the trial court did not abuse its discretion by denying the motion to
strike the Maroneys’ intervention.  Because
we were able to resolve Grandmother’s first and second issues without the need
of the missing reporter’s records, Grandmother has not met the statutory
requirements for a new trial under Rule 34.6(f).  See
Gavrel v. Rodriguez, 225 S.W.3d 758, 761 (Tex. App.—Houston [14th Dist.]
2007, pet. denied) (“If the missing portion of the record is not necessary to the appeal’s resolution,
then the loss of that portion of the record is harmless under the rule and a
new trial is not required.”).  We
overrule Grandmother’s sixth issue.

7.
Testimony by the attorney and guardian ad litem

 

In
Mother’s and Father’s third issues, they argue that the trial court erred in
allowing Deborah Boone, who served in the dual role of attorney ad litem and
guardian ad litem for the children, to testify. 
An attorney serving in the dual role of guardian ad litem and attorney
ad litem may not testify except as authorized by Rule 3.08 of the Texas
Disciplinary Rules of Professional Conduct. 
Tex. Fam. Code Ann. § 107.007(a)(4) (West 2008).  At trial, Boone requested to call herself to
testify in the narrative.  The court
asked twice if there was any objection, and no one objected.  Father only requested that Boone be sworn so
that he could cross-examine her.

Generally,
failure to object in the trial court waives the issue on appeal.  See
Tex. R. App. P. 33.1(a); Bushell v. Dean, 803 S.W.2d 711, 712 (Tex.
1991) (op. on reh’g).  However, Mother
and Father argue that allowing the guardian ad litem to testify is fundamental
error.  Fundamental error requires no
trial court predicate for appellate review. 
In re B.L.D., 113 S.W.3d 340, 350 (Tex. 2003), cert. denied,
541 U.S. 945 (2004).  Fundamental error
exists in those instances in which error directly and adversely affects the
interest of the public generally, as that interest is declared by the statutes
or constitution of our state, or instances in which the record affirmatively
and conclusively shows that the court rendering the judgment was without
jurisdiction of the subject matter.  Mack
Trucks, Inc. v. Tamez, 206 S.W.3d 572, 577 (Tex. 2006).

However,
because of “strong policy considerations favoring preservation,” the supreme
court has called fundamental error “a discredited doctrine.”  B.L.D.,
113 S.W.3d at 350 (quoting Cox v. Johnson, 638 S.W.2d 867, 868
(Tex. 1982) (per curiam)).  It is used
only in rare circumstances, such as when the record shows on its face that the
court lacked jurisdiction, and in juvenile delinquency cases.  Id.  The supreme court in B.L.D. noted that fundamental error is applied in juvenile
delinquency cases based on the “quasi-criminal” nature of those cases and that
“this rationale does not support applying the criminal fundamental-error
doctrine to parental rights termination cases.” 
Id. at 351 (declining to
extend the fundamental-error doctrine to unpreserved charge errors in
termination cases); see also In re L.M.I., 119 S.W.3d 707, 708 (Tex.
2003), cert. denied, 541 U.S. 1043
(2004), (stating that in the context of parental rights termination, “adhering
to our preservation rules isn’t a mere technical nicety; the interests at stake
are too important to relax rules that serve a critical purpose”).  Courts have also declined to apply
fundamental error to claims regarding constitutionality of termination proceedings.  See In
re R.B., 225 S.W.3d 798, 802 (Tex. App.—Fort Worth 2007, no pet.) (holding
that appellant parents’ claim that termination of their rights was
unconstitutional was not fundamental error and could not be asserted for the
first time on appeal).

Father
cites to Willis v. Premier Ins. Co.,
442 S.W.2d 912 (Tex. App.—Fort Worth 1969, no writ), for the proposition that
allowing the testimony of a non-competent witness is an appropriate issue in
which to apply the fundamental-error doctrine. 
Willis does not say that.  Willis
held that the trial court’s dismissal of a case for a witness’s willful failure
to answer cross-interrogatories was not a fundamental error.  Id.
at 914.  It was not fundamental error
because, the appellate court stated, fundamental error is limited “to
situations where (1) the public interest is adversely affected, (2) the
trial court was without jurisdiction of the subject matter, [or] (3) the
parties had no justiciable interest.”  Id. 
In that case, “[o]nly the rights of the plaintiff and defendant were
involved. The public interest was not involved. The parties to the suit did
have a justiciable interest.  The court
had jurisdiction of the subject matter.” 
Id.

Likewise,
we do not believe fundamental error is applicable here.  The public interest was not involved and only
the parties’ rights were at issue.  We
decline to apply the fundamental-error doctrine to this issue and we overrule
Mother’s and Father’s third issues.  See In
re S.G., No. 13-05-00155-CV, 2005 WL 1831962, at *1 (Tex. App.—Corpus
Christi Aug. 4, 2005, no pet.) (mem. op.) (following B.L.D. and declining to apply fundamental-error doctrine in a
termination case to an unpreserved complaint of “repeated references to
uncharged acts of prostitution”).

8. Statements by trial judge

In
Father’s second issue and Mother’s fourth issue, they complain that the trial
judge erred when he made a statement that Mother’s behavior during trial was
“important” for the jury to see.  While
DFPS’s attorney was questioning Father about his drug use, she stopped in the
middle of a question and said, “Your Honor, if I may, could you please ask
[Mother] to refrain from her waiving of the papers and making comments?”  The trial court responded, “No.  I think it’s important the jury see that.”  No party objected.

Mother
and Father make different arguments regarding preservation of the issue.  Mother argues that the trial judge’s comment
was fundamental error.  Father argues
that under rule 605 of the rules of evidence, no objection was needed to
preserve the issue.  See Tex. R. Evid. 605.  Rule
605 states, “The judge presiding at the trial may not testify in that trial as
a witness. No objection need be made in order to preserve the point.”  Id.  However, the trial judge’s statement in this case
was not testimony; he did not testify as to disputed facts in this case, he
commented on Mother’s behavior during trial. 
See In re M.S., 115 S.W.3d
534, 538 (Tex. 2003) (distinguishing judicial testimony from a judicial comment
on the weight of the evidence but noting that both are forms of proscribed
judicial influence).  “[J]udicial remarks
during the course of a trial that are critical or disapproving of, or even
hostile to, counsel, the parties, or their cases, ordinarily do not support a
bias or partiality challenge.”  Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 240–41 (Tex. 2001).  Furthermore, expressions of impatience,
dissatisfaction, annoyance, and even anger do not establish bias or partiality.
 Id. at 240.

Mother
cites to Blue v. State, 41 S.W.3d
129, 132 (Tex. Crim. App. 2000), for the proposition that a judge’s comments
are fundamental error.  Blue is a criminal case, and as we
discussed above, fundamental-error doctrine has developed differently in civil
and criminal case law.  See B.L.D.,
113 S.W.3d at 351.  Further, the judicial
comment in Blue (stating to the jury
that the defendant had considered a plea bargain) “vitiated the presumption of
innocence” and could allow a juror to “assume that the judge [knew] something
about the guilt of the defendant that the juror [did] not.”  Blue,
41 S.W.3d at 132.  Such a comment is
fundamental error because it cannot be rendered harmless by proper
instruction.  See Dow Chem. Co., 46
S.W.3d at 241 (“[O]bjection to a trial court’s alleged improper conduct or
comment must be made when it occurs if a party is to preserve error for
appellate review, unless the conduct or comment cannot be rendered harmless by
proper instruction.”) (citing State v.
Wilemon, 393 S.W.2d 816 (Tex. 1965)). 
Both parents note only that the judge’s comment “communicat[ed] to the
jury that [he] found Mother’s behavior important.”  They do not complain that the comment
communicated that the judge found Mother’s behavior improper or indicative of
her ability to protect and care for her children.  Neither Mother nor Father present any
argument that a proper instruction could not render the remark harmless.  We therefore decline to apply the
fundamental-error doctrine in this case, and we overrule Father’s second issue
and Mother’s fourth issue.

9. Best interest

In
Father’s first issue and Mother’s first and second issues, they argue that the
evidence is factually insufficient to support the jury’s finding that
termination of their parental rights was in the children’s best interest.

In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the verdict with our own. 
In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine whether, on the entire record, a
factfinder could reasonably form a firm conviction or belief that the
termination of the parent-child relationship would be in the best interest of
the children.  Tex. Fam. Code Ann.
§ 161.001; C.H., 89 S.W.3d at 28. 
If, in light of the entire record, the disputed evidence that a
reasonable factfinder could not have credited in favor of the finding is so
significant that a factfinder could not reasonably have formed a firm belief or
conviction in the truth of its finding, then the evidence is factually
insufficient.  H.R.M., 209 S.W.3d
at 108.

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209
S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be in
the child’s best interest.  Tex. Fam.
Code Ann. § 263.307(a) (West 2008). 
The following factors should be considered in evaluating the parent’s
willingness and ability to provide the child with a safe environment:

(1) the child’s age and physical and mental
vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the
harm to the child;

(4) whether the child has been the victim of repeated
harm after the initial report and intervention by the department or other
agency;

(5) whether the child is fearful of living in or
returning to the child’s home;

(6) the results of psychiatric, psychological, or
developmental evaluations of the child, the child’s parents, other family
members, or others who have access to the child’s home;

(7) whether there is a history of abusive or assaultive
conduct by the child’s family or others who have access to the child’s home;

(8) whether there is a history of substance abuse by the
child’s family or others who have access to the child’s home;

(9) whether the perpetrator of the harm to the child is
identified;

(10) the willingness and ability of the child’s family to
seek out, accept, and complete counseling services and to cooperate with and
facilitate an appropriate agency’s close supervision;

(11) the willingness and ability of the child’s family to
effect positive environmental and personal changes within a reasonable period
of time;

(12) whether the child’s family demonstrates adequate
parenting skills, including providing the child and other children under the
family’s care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline
consistent with the child’s physical and psychological development;

(C) guidance and supervision consistent with the child’s
safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even
though the violence may not be directed at the child; and

(F) an understanding of the child’s needs and capabilities;
and

(13) whether an adequate social support system consisting
of an extended family and friends is available to the child.

Id.
§ 263.307(b); R.R., 209
S.W.3d at 116. 

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)     the
desires of the child;

(B)     the
emotional and physical needs of the child now and in the future;

(C)     the
emotional and physical danger to the child now and in the future;

(D)     the
parental abilities of the individuals seeking custody; 

(E)     the
programs available to assist these individuals to promote the best interest of
the child;

(F)     the
plans for the child by these individuals or by the agency seeking custody;

(G)     the
stability of the home or proposed placement;

(H)     the
acts or omissions of the parent which may indicate that the existing
parent-child relationship is not a proper one; and

(I)      any
excuse for the acts or omissions of the parent.

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976)
(citations omitted).

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when
appropriate.  C.H., 89 S.W.3d at
27.  Furthermore, undisputed evidence of
just one factor may be sufficient in a particular case to support a finding
that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

The evidence

Abigail
was four years old at the time of trial, and Maria was almost two years
old.  See
Tex. Fam. Code Ann. § 263.307(b)(1).  Father’s criminal history dates back to
2005.  See id. § 263.307(b)(3).  In June 2005, he was charged with an accident
involving damage to a vehicle.  In
September 2005, he was charged with criminal trespass of his girlfriend’s
house.  Father was charged with failure
to appear on the previous charges in December 2005.  In June 2006, he was charged with evading
arrest.  He received probation, which was
revoked after two assaults on officers. 
He served ninety days in jail for the assaults starting in October
2006.  In 2008, Father served 40 days for
driving while intoxicated.

On
February 11, 2009, police were called to Mother and Father’s house for a
complaint of a domestic dispute.  The
parents admitted that marijuana was in the house, and a search revealed drug
paraphernalia in the bathroom.  Mother
admitted that the paraphernalia was hers; Father denied owning any of it.  Mother was arrested at that time for
possession of marijuana.

Mother
and Father were arrested in Round Rock, Texas in March 2011, after being found
asleep in their vehicle.  Father
testified that he did not recall being found unconscious in his car, but he
remembered waking up in jail.  The police
had found a needle, a pill bottle, and two soft drink cans with a black
substance in or on them.  The police also
found $3,500 in one hundred dollar bills in Mother’s purse.  Both Mother and Father were later indicted
for felony possession of heroin and cocaine after the substances were
tested.  At the time of termination, the
charges were still pending.

Amanda
Hoon, the assistant manager of a Buckle store in Vista Ridge Mall, testified at
trial that in March 2011, Father ran into the store, grabbed handfuls of
clothing, and ran out of the mall.  Hoon
followed him outside, where she saw him get into a white Nissan Sentra.  She jumped in the car after him. Father
pushed her out, and the car ran over her leg. 
The Buckle manager also followed Father out and saw that he had a knife
on him.  Father and the driver escaped,
but a witness got the license plate number of the car.

In
June 2011, Mother and Father were cited for criminal trespass at a Wal-Mart for
allegedly switching the tags on some bicycles. 
Father testified they were “[j]ust playing around.”  The police officer called to the store
testified that Mother and Father told him that they had switched the tags on
some bicycles, but they had paid the correct price for the bicycles that they
had purchased.  The officer discovered
that Father had an outstanding warrant for the robbery at the Buckle store, and
he was arrested.  Father had a felony
indictment for aggravated robbery pending at the time of trial.  The officer described Mother as
“argumentative” while he was arresting Father.

Dr. Mark Foster completed
the psychological evaluations of Mother and Father.  See id.
§ 263.307(b)(6).  His report on
Father noted that Father provided inaccurate information regarding his criminal
history and that Father was “frequently evasive in answering questions.”  He testified that Father’s results indicated
“somebody [who] has a number of significant antisocial personality features.”  He described Father’s responses as similar to
people who are “immature, narcissistic, and self-indulgent” and noted that
Father is probably viewed by others as “irritable, sullen, and argumentative.”  Dr. Foster described people with similar
results to Father’s, stating,

They are very high risk of abusing substances.
They tend to focus on their needs to an excessive extent. They tend to have
very poor impulse control. They tend to be very unreliable and have difficulty
maintaining employment. They have a lot of conflict in their relationships,
particularly within their relationships with persons that are perceived as
authority figures. It might be parents. It may be law enforcement. That sort of
thing.

 

Dr. Foster said that this
type of people seek treatment for their behaviors as “an attempt to avoid the
consequences of their actions.”  He
reported “a poor prognosis for recovery” and that people like Father “are
frequently asked to leave substance abuse treatment programs due to persistent
denial of their treatment issues or rules violations.”  He expected that short-term treatment would
not be effective for Father, and he defined short-term as “a couple of
years.”  He stated that Father is
“probably unrealistic and grandiose in his self-appraisal” and would be
“unlikely to be receptive to traditional counseling or psychotherapy.”

Dr. Foster testified that
turning to heroin “is not a normal response to having your children removed,”
and that such behavior “would confirm the test results, that this is somebody
that has very poorly developed coping skills.” 
As for Father’s parenting abilities, Dr. Foster testified,

I would expect him to have a lot of
difficulties meeting the responsibilities of being an effective parent.  I would expect him to behave irresponsibly,
to put his needs before the needs of the child. I would expect a great deal of
moodiness which would undermine the child’s security.  I would expect him to place the child at
risk.

 

Father did not disclose
to Dr. Foster that he was taking methadone. 
Dr. Foster stated that Father was “unable or unwilling to acknowledge
how his substance misuse impair[ed] his ability to provide a safe and nurturing
environment for [Maria].  His substance
misuses pose[d] a significant risk to [Maria]’s safety.”  Dr. Foster noted that although Father was in
treatment, there was “little evidence that [Father’s] denial of his substance
misuse issues [had] been addressed.”

As to Mother’s test
results, Dr. Foster testified that Mother’s IQ was “at the bottom of the
average range.”  Mother’s reading skills
were between the ninth and tenth grade level, and “her responses reflected a
very high risk of continued substance abuse use, [and] a good deal of denial
with regard to her substance abuse issues.” 
He described Mother’s personality as “more of a narcissistic
personality, meaning . . . a personality characterized by high level of
immaturity and self-centeredness.”  He
testified,

Narcissistic individuals have a great deal of
difficulty appreciating how their choices affect others, particularly
children.  Their needs tend to come
first.  They tend to abandon their
responsibilities very quickly.  One thing
that’s consistent with antisocial personality features is they also are very
unlikely to seek treatment on their own accord; that is, they usually enter treatment
as a result of pressure from family, friends or the authorities.

 

Dr. Foster testified that
Mother did not indicate to him that she believed she had a substance abuse
problem.  He noted that Mother

maintain[ed] a high level of denial with
regard to her substance misuse issues and its impact on her ability to parent
effectively.  Her continued denial
despite being arrested on substance and possession charges is reason for
concern.  Her failure to complete the conditions
of her probation is also reason for concern. 
There is a high risk of relapse among persons with her pattern of
responses in history.  It is common for
persons like [Mother] [to] be asked to leave substance use treatment programs
due to their lack of cooperation.  Her
negative treatment attitudes pose a significant risk to both her safety and
that of her children.

 

Dr. Foster also reported,
“It is common for persons like [Mother] to abstain from substance misuse while
[their] behaviors [are] being monitored by the authorities.  These periods of sobriety may lead others to
believe that her behavior has changed only to find that she will relapse once
her legal difficulties have subsided.”

He believed that Mother
and Father’s relationship was “probably very unstable.”  He believed that, as parents, he would
“expect a high risk of neglect” of the children.  In order to effect change, Dr. Foster
expected that Mother and Father would need “many months, if not many years” of
counseling.  He said that continued
arrests were an indication that the parents were not making progress.

When
Father was asked if he had ever been verbally abusive to Mother, or if she had
ever been verbally abusive to him, he responded, “I mean every couple gets into
fights.”  See id. § 263.307(b)(7).
 He denied any physical abuse between
them.  He also said that he would never
fight with Mother in front of the children. 
Mother also testified that although they had fights “like every couple,”
there was no violence between her and Father.

Stephanie
Kolb, a DFPS investigator, testified that she witnessed a physical altercation
between Mother and Father at a court hearing. 
Mother shoved Father in the courtroom. 
Ex-Husband also testified to an instance in the courtroom when Mother
hit him after learning that her children were being removed.

Mother
testified that Ex-Husband fractured her arm in a fight that occurred in front
of Abigail.  Ex-Husband testified that
Mother was angry at having to pick up Abigail and that she vandalized his car
and started swinging at him.  Mother
called the police and told them she had broken her arm, but Ex-Husband
testified that Mother never went to the hospital, and never had a cast or any
other evidence of a broken arm. 
Ex-Husband was charged with a Class C misdemeanor of criminal mischief
for vandalizing the hood of Mother’s car by striking it with his fist.  Ex-Husband testified that Mother had thrown
dishes at him “[a] couple of times.”

          Father’s testimony regarding his drug
history was inconsistent.[7]  See
id. § 263.307(b)(8).  He
testified that he did not use drugs prior to the children’s removal.  He also testified that prior to 2009, he had
“no issues” with drugs, although he did admit to having used drugs by that
time.  From age sixteen to twenty-two,
Father used marijuana and drank alcohol. 
He also admitted to telling First Steps that he used ecstasy at age
sixteen.  He did not recall telling First
Steps that he had used mushrooms, cocaine, and opiates.

When
DFPS first visited Mother and Father in July 2010, it asked the parents to take
drug tests.  The parents refused.  Father testified that he now regrets refusing
the drug test.

Father
testified that he had used cocaine and heroin in the past two years and had
used methamphetamine once.  He stated
that he used heroin before Mother was pregnant with Maria and again after Maria
had been removed from their home.  Maria
was removed on October 12, 2010, and Father tested positive for methamphetamine
and cocaine on October 13, 2010.  At
trial, he said that he did not know anyone who sells drugs or where to go to
buy drugs.  He claimed that Mother had no
idea that he was using drugs.  At trial,
Father agreed that turning to drugs was an inappropriate way to react to his
child’s removal.

Father
testified that between July and October 2010 was the first time he had used
drugs in years.  Father also tested
positive in May 2011, which he claims was the result of drug usage in March
2011.  On March 1, 2011, Round Rock
police officers found Mother and Father asleep in a car in the parking lot of a
hotel.  The officers found a coke can
turned upside down in the center console with a “black tar substance” on it,
which the officers believed was heroin.

Father
said that he did not know how much heroin he was using before he went to the
methadone clinic, or how often he was using. 
He testified, “I don’t recall.  I
mean, it was a problem, I know that.” 
Father went to First Steps in April 2011 to have his drug and alcohol
evaluation.  He told First Steps that he
did not use drugs and he had only tested positive for marijuana once two years
before.  He testified at trial that what
he had told First Steps was untrue. 
Father first told Moore that his clean date was March 15 or 16,
2011.  He later changed it to March 21,
2011.

Father
testified that he had been using cocaine and heroin together, and that the
services he was receiving at the methadone clinic were sufficiently treating
his addictions, and that he was getting counseling through the clinic.  Father testified that he was not attending AA
or NA meetings.

The
First Steps counselor said she had concerns about Father’s honesty.  She testified that Father was “guarded
regarding the history of alcohol and drug use, [and] he was irritable during
the process.”  She testified that Father
attended only nineteen of forty-two group sessions and only two individual
counseling sessions.  She described
Father as initially “very irritable” and said that he had the mentality that
people were picking on him.  She said
that Father would get very angry, and that he would curse and walk out of
sessions.  Father was eventually
discharged as unsuccessfully completing therapy for lack of attendance.

Mother
testified that she started using heroin after her children were removed.  Although a bag of marijuana was found in her
house on February 11, 2009, she denied using at the time.  She later clarified, “I meant at the time
that that happened, that the incident happened, I was not under the
influence.”  She claimed that she used
the marijuana alone and not in the house.  Mother testified that she smoked on the
patio.  The police officer who was called
to her house in February 2009 testified that Father told him that Mother smoked
in the restroom.

Mother
admitted at trial that she should not have turned to drugs when her children
were removed.  Mother told First Steps
that she had been taking valium for two and a half years, starting in the
summer of 2008.  At trial, she said that
she wrote down that she was using valium because she thought it was the same
thing as hydrocodone.

Mother
testified that she had been prescribed hydrocodone and was still taking
hydrocodone when she started using heroin. 
She testified that she was not addicted to hydrocodone or any other drug
until December 2010.  She said that she
told Denton Treatment Services that she had been addicted to drugs for two
years because she was told that they would not help her unless she had been
addicted for at least that long.

The
First Steps counselor testified that she heard Mother’s testimony that she had
not been addicted to drugs until December 2010, and she testified that was
different from what Mother said in her group sessions at First Steps.  The counselor testified that Mother told her
she was using heroin daily with Father, and that Mother was afraid that she
would die if she continued using at the rate she was currently using.  The counselor said that she was concerned
with Mother’s credibility.

At
First Steps, Mother told the counselor that she had been taking valium daily
for two and a half years.  The counselor
testified that such an amount for that period of time would indicate a “high
probability” of addiction to valium but that methadone would not be used to
treat a valium addiction.  The counselor
said that she first recommended a supportive outpatient program for Mother,
which is a less intensive program than the intensive outpatient program.  But after Mother admitted to more drug use,
First Steps increased the level of suggested treatment to intensive outpatient.

At
trial, Mother said, “I honestly believe that I feel that I have successfully
overcome my addiction.”  She then
explained that she knew she was not done with treatment, but that she has
successfully stopped using drugs.  The
First Steps counselor testified that Mother and Father were improving at the
time they were discharged, but that they had a long way to go.

Mother
tested positive for ecstasy in August 2010. 
When Father learned the results of Mother’s drug test, he laughed and
said that someone must have put something in Mother’s drink while she had been
working as a waitress in a strip club. 
Moore testified that the levels of creatine in the parents’ drug tests
concerned her that they were possibly trying to hide their drug use.

Dr. Ann Arcuri was the
therapist at Denton Treatment Services, the methadone clinic that Mother and
Father were using.  Dr.
Arcuri testified that at least a one-year history of opiate dependence is
required for admittance to the methadone treatment program at Denton Treatment
Services.  Father told her that he had
been addicted to heroin for three years. 
Mother reported to her that she had a two-year history of dependence.  Mother and Father met with Dr. Arcuri once a
month, which Dr. Arcuri testified was not often enough to make a change.  Dr. Arcuri said that counseling once a month
is the minimum requirement to stay in treatment, but a patient would need to be
in therapy at least once a week for fifty minutes to make a change.  She testified that she had asked Mother and
Father to come in more frequently, but they refused.  She said that she expects patients to stay
for fifty minutes, but Mother and Father would only stay for ten minutes.  Dr. Arcuri said that there has been “a slight
improvement” with Mother.  Mother
testified that she talks with Dr. Arcuri “a couple times a week” and that she
stays in the session until Dr. Arcuri tells her that her time is up.

Mother
told Dr. Arcuri that she was excited to start methadone treatment because “her
heroin usage was out of control.”  Dr.
Arcuri has had trouble getting Mother to attend counseling, however.  On June 27, 2011, Mother went to the clinic
and was told that she could not receive methadone until she had attended a
counseling session, because she had not attended any counseling that
month.  Mother told the counselor that
she did not have time and did not want a counseling session.  When the counselor insisted, Mother said,
“Fuck off, bitch.  I’m in a bad mood.”

Mother
testified that in addition to the counseling at Denton Treatment Services, she
was in intensive outpatient treatment and seeing a therapist.  Mother testified that she had informed Dr.
Arcuri that she had been seeing other counselors but that Dr. Arcuri must have
forgotten that conversation.

Mother
testified that she looked for NA and AA meetings while living in Nacogdoches
but could not find any.  She did not look
for meetings in Austin, but she has “occasionally” attended some meetings since
returning to Denton.  Mother defined
“occasionally” as “a couple of times a month. 
I mean I just—I go every now and then.” 
When asked about the number of times she attended a meeting in the three
months preceding trial, Mother could not give a number.  She did not have a sponsor by the time of
trial and had not started working the steps.

Mother
was asked about the drug test she failed when her children were removed.  She said the result was the consequence of
making “a bad decision to work somewhere [she] shouldn’t have.”  She was further questioned about her
marijuana use and her addiction to heroin and hydrocodone, and she responded,
“I know I’ve done stuff that’s wrong.”

Mother
testified that she did not believe she failed to comply with DFPS in their
investigation or that she failed to comply with her court-ordered service
plan.  See id. § 263.307(b)(10).  The
DFPS investigator, Stephanie Kolb, testified that Father was “[v]ery, very
hostile” to her during her investigation. 
She said that Father would yell at times and was “over-the-top with
emotions.”

Moore
testified that Mother would not return her calls and that Moore set up three
different appointments to meet with Father but he did not show to any of
them.  Moore sent Father an email asking
for information, and he responded “that he [was] not going to do [her] job for
[her]. Since [she] was making his life hard, he was going to make [her] life
hard.”  Moore testified that less than a
month and a half before trial, Father told Moore that he was moving to Austin,
and Moore asked him where he was living so she could transfer his
services.  Father told her that he did
not know his address.  When she asked
where he would be working, he told her that she did not need that
information.  Moore testified that twice
she had to go to court to get information from him.  When Moore asked Mother and Father about
whether they had seen Maria on an unapproved trip to Nacogdoches, they “both
immediately said no,” which Moore knew was not true based on pictures she had
of Father walking with Grandmother, Grandfather, and Maria.

When
DFPS first visited Mother and Father in July 2010, it asked the parents to take
drug tests.  The parents refused.  Kolb decided not to keep Maria with Father
because “[t]here was a very big concern of his protectiveness and due to the
behaviors that he exhibited.  He made it
very clear he did not believe that our drug test was true and made a comment
that even if it was, what’s—what’s the big deal.”  Kolb discussed with Mother the option of
voluntarily placing the children somewhere, but Mother “did not see the need
for it so [she] was not going to do that.”

Moore
testified that Mother and Father failed to show up for a number of drug
tests.  Father testified that he had been
ordered to participate in a drug and alcohol assessment in October 2010 but
that he did not complete the assessment until April 2011.  Father testified that he moved to Austin in
late December 2010 but did not get the 2054 forms to start his services there
until April 2011.  He claimed that Moore
was supposed to call him with information, but that he never heard from her.  The First Steps counselor testified that
Father told First Steps that he was transferring his services to Austin.  The counselor said that Father’s files would
have been transferred to Austin on request but that he never told her where he
would be receiving treatment in Austin.

Father
claimed that he was unable to keep a fulltime job and attend all the classes he
was required to attend at the same time. 
So, in April 2011, he quit his job and returned to the Denton area to
complete his services.  Father testified
that he took parenting classes that he paid for on his own because DFPS did not
pay for them.

Mother
did not complete her drug and alcohol evaluation until January 2011.  Mother did not schedule her psychological
evaluation with Dr. Foster until February 2011. 
She testified that she did not receive recommendations based on her
evaluations to complete more services until April 27, 2011, which was about six
and a half months after her case had started.

Moore
testified that Father was scheduled for an appointment for his psychological
exam in March 2011, but that Father did not show up.  Father testified that he did not make an
appointment to see Dr. Foster until June 2011. 
He claimed that at the appointment, he filled out some paperwork but
that Dr. Foster did not talk to him at all, and he never heard from Dr. Foster
after that.  Dr. Foster testified that he
and Father spoke for about forty-five minutes.

Mother
testified that she informed her caseworker when she moved and went to the DFPS
office in Nacogdoches “a couple of times trying to talk to somebody.”  Jocelyn Watkins, a DFPS supervisor, testified
that services were set up in Nacogdoches and that Mother had a caseworker
assigned in Nacogdoches.  Julie Westlake,
a supervisor for DFPS investigators, testified that Mother and Father moved so
often towards the end of the case that the Department lost track of them.  Kolb testified that they were unable to
contact Mother for about three weeks. 
Westlake said that DFPS wanted another drug test from Mother, but it was
never able to get it.  Kolb testified
that on August 27, 2011, she went to Mother and Father’s house to look for
Mother.  She saw cars in the driveway,
but no one would answer the door.

Mother
testified that while she was in Nacogdoches, she made efforts to complete her
services.  She said that every time she
would drive to Denton for visitation with her daughters, she would try to
schedule appointments such as her psychological evaluation and her drug and
alcohol evaluation.  Kolb testified that
she could not verify that Mother was living in Nacogdoches and that she had no “communication”
with Mother or Father about setting up services there.

Mother
testified that in January 2011, she was still in denial about needing help for
her drug addiction, and that is why she lied on her First Steps intake.  Mother only attended twenty-four of the
forty-two group sessions offered through First Steps.  Mother testified that she missed some
sessions because they interfered with her GED classes.  The First Steps counselor testified that
Mother did make progress “at one point.” 
The counselor testified that Mother initially fell asleep in class and
refused to attend sessions without Father. 
First Steps recommended that Mother attend the women’s group
sessions.  The counselor testified that
initially Mother would only attend group sessions with Father, and Mother said
it was because of transportation problems. 
Mother and Father were both discharged from First Steps for lack of
attendance.

Father
admitted that his frequent moves “probably played a part” in DFPS’s difficulty
in setting up his services.  Mother
testified that when she informed DFPS that she and Father were moving back to
Denton and that they wanted to complete parenting classes, DFPS told them that
because they were moving to terminate the parents’ rights, the Department would
not pay for parenting classes or Father’s psychological evaluation.  Mother testified that she and Father enrolled
in the Love and Logic Parenting Class at First Steps on their own initiative.  Mother also enrolled in a GED program at her
own cost.

Moore
testified that the parents attended appointments “sporadically” but that their
“behaviors and attitudes had not changed in regards to the reasons the children
came into care.”  See id. § 263.307(b)(11).  Father
was asked, “Do you remember telling the Court—being hostile and telling the
Court numerous times that [DFPS] had no reason to be involved in your
life?”  He responded, “I’m sure I said
that.”

Father
testified that he has been drug-free for approximately six months, since he
started attending Denton Treatment Services. 
He said, “I feel I’m a totally different person as to how I was when I
was rebelling after high school. I mean, totally different. I don’t do anything
wrong. I don’t even have any friends. I mean, me and [Mother] are the only
people we talk to.”  He says that he no
longer socializes with his previous friends because they were a “[b]ad crowd.”

Mother
testified that she had not paid any child support by the time of trial.  See
id. § 263.307(b)(12).  She testified that she smoked while pregnant
with Maria, and, by the time of trial, had not yet been able to quit smoking
completely.  Mother testified that she
believed she was on time to all her visitation, “give or take maybe five
minutes.”  Moore testified that at a
visitation in April, Mother “appeared to be very sleepy, very tired, her speech
was slurred and slow.  And it was
concerning that she may be under the influence of something.”

Father
testified that he worked as a welder and made $23 an hour, so he could use his
wages to pay for the children’s needs.  See id. § 263.307(b)(12)(A).  Moore
testified that she saw improvement in the types of foods that Mother and Father
brought to visits.

Father
testified that he loved Maria “more than words can explain” and that she loves
him too.  See id. § 263.307(b)(12)(B).  He
believed he and Mother had the ability to properly care for Maria.  He testified that when DFPS removed the
children from his care, the house was “spotless” and the children were healthy
and clean.  Father testified that he did
not remember any occasion where he was admonished for his behavior at visits
with his child.  He said he had always been
on his best behavior.

Mother
testified that she learned the love and logic style of parenting, a “style of
parenting where you allow your children to make more choices and you give them
a lot of choices to make and let them make good decisions and a lot of positive
reinforcement.”

Moore
testified that of the visits she observed, there were “only one or two visits
[that] [she] would classify it as an appropriate visit.”  See
id. § 263.307(b)(12)(C).
 She
testified,

There was a visit where
[Father] brought Pop-It fireworks to the visit and attempted to pop them
indoors.  There was a visit when [Father]
was giving [Maria] Dr. Pepper in her sippy cup, was asked not to do it.  He informed us not to tell him how to parent.

 

. . . .


 

A
following visit, he attempted to do that again.  I informed him his visit would end if he
continued to give her Dr. Pepper.  He then
tried to give her Dr. Pepper and then he refused to leave the visit room, where
I had to tell him I was going to call the police if he did not leave the
building.

 

Moore
said that when Father got irate, Abigail hid under a table.  When Moore told Father that she was going to end
his visit, Father told her that “his mother had custody of the child, and she
was the only one that could tell him what to do.”

Mother
and Father testified that Mother’s family was not very supportive of them.  See id.
§ 263.307(b)(13).  Mother
called her mother a “pill head.”  Moore
testified that Mother’s mother was not a suitable placement for the children
because of her “mental instability.”  Ann
Maroney testified that Mother’s mother was “very unstable at this point,
and she [was] involved with some prescription drugs. She’s also married to a
meth addict.”

Ex-Husband
testified that he believed that Grandmother and Grandfather “enable a lot of
things, maybe not directly or intentionally, but [he] think[s] they have
enabled unintentionally.”  Grandmother
and Grandfather owned the house that Father rented and the car on which Father
made payments.  Father paid Grandmother
$2,000 a month, which covered his rent and car payments.  Father
testified that Grandmother bonded him out of jail after his arrest in Round
Rock for possession of controlled substances and for the aggravated
robbery.  Mother testified that
Grandmother provided a lot of support, including toys and clothes for the
girls.  Grandmother testified that in
early 2011, she had not heard from Mother or Father for “awhile” and searched
online to find out if they had been arrested. 
Grandmother did not have a discussion with Mother or Father about the
arrest after she found out about it.

Police
officer John Martinez testified that he was called to investigate the robbery
at the Buckle store. A witness identified the license plate of the car used in
the robbery, and Officer Martinez discovered it was Grandmother’s car.  He called Grandmother and asked for Father’s
address, but Grandmother said she did not know it.

Grandmother
asked Father about his arrest on June 16th, 2011, but at trial, she said that
Father “did not understand why he was arrested.”  Grandmother said that the information in the
police report regarding Father’s arrest was concerning, but she did not have
concerns about Father’s parenting abilities based on his criminal history over
the months preceding trial.  When asked
if she thought Father had engaged in dangerous conduct through drug use or
criminal conduct, she said, “I believe it’s possible.”  She did not believe that Father had put Maria
in danger by doing drugs during the course of the case.  She testified that although she had never
seen signs of drug use from Father, she would make him take drug tests to know
if he was using drugs in the future.  She
said that she knew Father would comply with requests for drug tests because she
had made him take them before.

Patience
Galindo, the kinship development worker for DFPS, testified that Grandmother
told her that she did not believe that her son was using drugs and that she had
never seen any sign of drug use, despite the parents’ previous positive drug
tests.  She thought that Grandmother
appeared unwilling to accept what was going on with her son.  She testified that Grandmother said “many
times that she didn’t understand why she had to follow the rules that [DFPS]
set forth because she had custody of [Maria]. 
And it had to be explained to her that she did not have custody of
[Maria], she had placement.”  Galindo
testified that a person cannot be protective of a child if they do not believe
what is happening to the child.

Grandmother
paid for both parents’ methadone treatment. 
She said that when Mother asked her to pay for her treatment,
Grandmother did not ask what kind of drugs Mother was using.  When asked what drugs she thought Mother and
Father might have been using, she said, “I had no idea and I did not care.  I just knew they needed help.”  She testified that she did not see methadone
as a serious drug.  She said, “I would
see it as treating, like a headache, treating.” 
Grandmother testified that she had never received a copy of the service
plan that Mother and Father were required to complete, that she did not know
whether they were working their services or not, and that it was not a concern
of hers to check that they were making progress.

Father
testified that Grandmother and Grandfather took Maria to Nacogdoches to visit
Mother’s grandmother.  Father said that
Grandfather dropped Grandmother and Maria off at Mother’s grandmother’s
apartment and then met up with Father and Mother at the storage unit.  Mother and Father then returned Grandfather
back to the apartment where Grandmother and Maria were.  However, Grandmother testified that she,
Grandfather, and Maria met Mother’s mother at the storage unit.  After unlocking the storage unit for
Grandfather, Mother’s mother drove Grandmother and Maria to Mother’s grandmother’s
apartment.

When
Mother and Father arrived at Mother’s grandmother’s apartment, they stood in
the hallway while Grandmother gathered her things inside the apartment, and
walked past Mother and Father with Maria on her way to the elevator.  Mother found Maria’s sippy cup in the
apartment and brought it down to the parking lot to give to Grandmother.

Mother
testified that DFPS never said they could not go to Nacogdoches, only that they
could not all go together.  Grandmother
testified to the same thing.  Grandmother
testified that she was never told that she needed to notify DFPS of any unplanned
interactions between the parents and Maria. 
Galindo testified that Grandmother was told in both permanency
conferences that she needed to report unplanned interactions.  When Grandmother returned from Nacogdoches
and was asked if Mother and Father had visited Maria, she told the Department
no.  She did not tell DFPS that she had
passed them in the hallway accidentally. 
Grandmother said that she was angry at Mother and Father for going into
the apartment building and that she talked to them about it later, but she did
not remember what their responses were.

Moore
testified that Father told her that DFPS had previously allowed visits outside
of standard visitation, which concerned Moore. 
Moore also said that she told Grandmother that the parents could not go
to Nacogdoches because they had not been working their services.  She testified that Grandmother was not able
to control Father during visitation.

Grandmother
testified that Maria was always “elated” to see her parents at visitation.  See
Holley, 544 S.W.2d at 371–72.  The
guardian ad litem testified that Abigail talks less about Mother now than she
used to.  Ex-Husband testified
that Mother missed visitation with Abigail for the first half of the case,
which made Abigail upset.  See id. 
He said that since Maria had been placed with the Maroneys, the girls
get to see each other much more often. 
He testified that if Maria stayed with the Maroneys, he would be able to
maintain a relationship between the two children.

Ex-Husband
testified that Abigail told him about fights she witnessed between Mother and
Father.  See id.  He felt that Mother
did not take appropriate steps to prevent Abigail from exposure to fights.  Ex-Husband was concerned about Mother and
Father exposing Abigail to verbal abuse and physical violence.

Maria
was placed with the Maroney family after being removed from Grandmother.  Ann Maroney testified that she was
thirty-four years old and was a stay-at-home mom to Maria and her two other
children, who are thirteen and eleven years old.  She said that her children love Maria and
that Maria calls them Sissy and Bubba. 
Ann has been married to Bob for sixteen years, and they have a large,
five-bedroom, three-and-a-half-bath house.

Ann
testified that there was tension between her and Mother because of a tense
relationship that Ann had with Mother’s mother. 
Ann said that while Mother lived with them, Mother would stay out late
with Abigail, while pregnant with Maria, and return home between 1:00 and 3:00
in the morning.  Mother would get up

anywhere between
12:00 and 1:00 o’clock in the afternoon. She would grab [Abigail] a package of
Teddy Grahams and herself a Coke and go outside and smoke a cigarette and talk
on the phone for probably a good hour. And then she would come inside—come inside
and she would get herself ready, and then she would leave.

 

Ann
said that she met Father once and “wasn’t very impressed.”  Ann said that she never spoke to Mother about
Mother’s behavior while Mother was living at her house because “you have to be
careful with what you say to her.  She
gets—she gets mad very easily.”  Ann
described a time when Abigail would not put her shoes on and Mother screamed at
her so loudly it frightened Ann’s children.

Ann
said that when Maria was born, she sent Mother a congratulatory text
message.  Mother responded that “if [Ann]
had a problem with her mom, then [Ann] had a problem with her and to basically
go to hell and never contact her again.” 
Ann testified that she blocked Mother’s number on her cell phone in
January 2010 because she was “getting harassing text messages at 2:00 or 3:00
o'clock in the morning, one after another, after another, after another.”

 Mother testified that she was “[m]ost
definitely” concerned about Maria living with the Maroneys. See id. 
She said that she was concerned that the Maroneys would not treat Maria
as well as their other children.  Mother
said that the last time she talked to the Maroneys, they told her they were blocking
her number.

Father
testified that he believed he was a better parent than the Maroneys.  Father said that the Maroneys had never
called Mother or tried to see Maria until she was placed in their home by
DFPS.  Father testified that when Mother
was living with the Maroneys, they refused to feed her.  He said that Mother left the Maroneys’ house
and moved in with him and his parents “for that specific reason.”  Father said that Mother only lived with the
Maroneys for two weeks.

Mother
testified that when she lived with the Maroneys, they “made [her] feel really
unwelcome with [her] daughter.”  She
said,

I mean they wouldn’t
let her—she would like to carry around her sippy cup.  They had hardwood floors.  They wouldn’t let her carry it around.  They didn’t want her to be able to have
snacks.  They didn’t want her to bring any
of her toys downstairs.  I constantly
just—I mean I felt like I just needed to stay upstairs and hide from them
because of all the rules that they had.

 

Ex-Husband
had observed the Maroneys and Maria together, and he testified that the
Maroneys “seem[ed] to be great parents.” 
He said that their house was well-kept and that Maria was always
properly groomed.  Ex-Husband testified
that Mother would sometimes tell Abigail that it was DFPS’s fault that Mother
missed visitation.

Moore
testified that she has observed the Maroneys with Maria.  She said that Maria gets along well with the
Maroneys’ other children and that Maria’s grooming was always fine.  Moore believes that Maria’s best opportunity
for success was with the Maroneys because “[t]he [Maroney] household is willing
to provide permanency and stability for the child. The [Maroney] household is
also protective.”

Father
testified that he believed that Mother was a very good parent and that she
“care[d] about her kids a whole great deal.” 
Maria’s nursery nurse when she was born testified that she was concerned
about Mother’s bonding with Maria because Mother would not request to see
Maria.  The nurse testified that the only
time Maria was taken out of the nursery was when Mother’s mother was
visiting.  The nurse said that Mother
would not maintain eye contact with her or speak to her.

Mother
testified that Father was a good father. 
She said,

He was always very
attentive. I mean it’s just—it was so obvious that he cares about her more than
anything in the entire world. I knew before I even had [Maria that] he was
going to be a good father, the way that he cared for [Abigail], and [s]he
wasn’t even [his] biological daughter.

 

Mother
testified that Ex-Husband was a good father who had never done anything to hurt
a child.  She had no fear that Ex-Husband
would use drugs in the future, despite having used drugs in the past.  She believed that Ex-Husband made appropriate
decisions regarding the people he allowed to be around his daughter.  She agreed that, at the time of trial, he was
in a better position to decide how often Abigail should be allowed to see
Mother.

Ex-Husband
testified that he had concerns about Father being around Abigail because of a
“drug environment.”  He had asked Mother
if Father was still using drugs and Mother had “swor[n] to [him] and [had] promised
[him] that [Father] was different, he didn’t mess with that anymore.”  Ex-Husband said that Abigail attends
preschool five days a week and that she is doing “great” in school.  He thought that when he first got possession
of Abigail during this case, she might have been behind in some of her
development, but that he believed she had surpassed where she should be
intellectually.  He said that Abigail
loves arts and crafts and to go fishing with her half-brother.  Abigail and her half-brother “love each other
to death.”

Ann
Maroney testified that she and her husband would like to adopt Maria.  Ann testified that she would like to put
Maria in counseling at some point to help deal with the loss of her
parents.  Ex-Husband would like to be
solely responsible for Abigail’s safety and welfare.

Father
testified that he believed his wages were enough to support a family.  See
id.  He said
that Mother would care for the children while he was at work.  Mother explained her plan for her children,

I would love to be
able just to be there with them.  I
wasn’t there when [Maria] took her first steps. 
I wasn’t there when [Abigail] got her ears pierced.  I missed out on my children’s like moments in
their lives.

I just—I want to be
able to be a mother to them.  I mean I
would like to put them—you know, if I were to get them back, I would like to
keep [Abigail] in whatever preschool she’s in, to minimize change.  I would keep [Maria] in whatever daycare
program she’s in to, you know, minimize change for her for social, you know, so
that she can socialize with other kids and stuff.  I would love to be able to take the kids to
church with me.

I mean since my—I’ve
refrained from my addiction, I’ve started going to church again, [Father] and I
have, [to the] Village Church in Denton. 
I would like to be able to go on family vacations again.  I would like to be able to—I mean when I get
on my feet more financially, to start a savings account for my children so that
they can choose to go to college if they like or—I just know more now than I
did before.

And I just—I don’t
think that the rest of my life should be defined by the mistake that I made or
the rest of my children’s lives by not having their parents.

 

Father
and Mother moved frequently during the time their DFPS case was open.  Moore testified that their frequent moves
made their housing situation unstable.  They
lived in a house rented from Grandmother and Grandfather from early 2010 to
August 2010.  At that time, Mother moved
to Nacogdoches, and Father moved shortly thereafter.  Father testified that he did not have a job
when he moved to Nacogdoches.  He then
got a job near Austin, and moved down in November.  Mother followed him in December.  They moved back to Denton in March 2011.

Father
testified that he planned on marrying Mother but was waiting for a time when he
would be “in a place in [his] life where [he could] give her a wedding.”  Moore testified that Mother seemed “very
dependent on [Father], or any male in her life, and it would be concerning that
she would proceed to get into another unhealthy relationship with another inappropriate
person.”

Analysis

Moore testified that neither parent requested an
extension so they could complete their services.  Grandmother testified that at the time of
trial, she did not think that Mother and Father were ready to have the children
returned to them.  She did think that
they had made significant improvements since the beginning of the case.  Ex-Husband testified that he
was “very concerned and disturbed” by the possibility of Abigail going back to
Mother if her rights were not terminated. 
He was also concerned about Abigail’s ongoing relationship with
Father.  He stated that he was concerned
for Abigail’s safety as long as Mother and Father were together.  He believed it was in Abigail’s best interest
to terminate Mother’s parental rights. 
He testified that it would “possibly” negatively affect Abigail if
Mother’s rights were terminated but that it would also possibly negatively
affect her if Mother’s rights were not terminated.

The
parents’ testified that they made attempts to complete their services in the
different cities where they had lived. 
However, Department employees testified that the parents appeared to avoid
their services.  After the children were
removed, the parents continued to behave in a manner that did not indicate that
they had good judgment or that they took the children’s removal seriously.  See In re J.L.B., 349 S.W.3d 836, 849 (Tex.
App.—Texarkana 2011, no pet.) (noting that the parents' “poor judgment [and]
the constancy of their drug use” weighed in favor of terminating their parental
rights).

While
the evidence was uncontroverted that both parents had been drug free for about
six months by the time of trial, neither parent was attending NA or AA meetings
regularly, and they had been discharged as unsuccessfully completing First
Steps.  And although both parents were on
methadone for opiate addiction, they both testified that they did not have the
requisite addictions required to be treated at the methadone clinic.  If they did not have the addiction they told
the clinic they had, then they were dishonest with the clinic.  If they did have a long opiate addiction,
then they were dishonest at trial.  The
inconsistencies in their accounts concerning their drug use show a pattern of
misrepresentation or dishonesty.  Dr.
Foster’s reports for both parents warned of the likelihood that they would
relapse.  Further, “evidence of improved
conduct, especially of short-duration, does not conclusively negate the
probative value of a long history of drug use and irresponsible choices.”  In re J.O.A., 283 S.W.3d 336, 346 (Tex. 2009).

Both
parents had been incarcerated.  See In
re J.B.W., 99 S.W.3d 218,
229 (Tex. App.—Fort Worth 2003, pet. denied) (holding that incarceration is one
factor courts can consider when determining the best interest of a child in a
termination case).  Father had an
extensive criminal history dating from 2005. 
See R.R., 294
S.W.3d at 235 (considering evidence of a father's past convictions supportive
of the trial court's best interest finding); In re S.M.L., 171 S.W.3d 472, 480 (Tex.
App.—Houston [14th Dist.] 2005, no pet.) (stating that the father’s
incarceration and pattern of criminal and violent conduct made it likely that
he would face incarceration again in the future).  Even after they had stopped using drugs, the
parents continued to engage in criminal activity.  They both had pending charges at the time of
trial.

Their
service plan required both parents to maintain employment and suitable housing
for their children. Neither parent contests the sufficiency of the evidence to
support the trial court’s finding that they failed to comply with the
provisions of the court order that specifically established the actions
necessary for the return of their children. 
The fact that neither parent had stable employment or housing, along
with the evidence that made obtaining those necessities doubtful based on past
conduct, could be compelling evidence that termination of the parents’ rights
would be in the best interest of the children.

Moore
testified that DFPS believed it was in Abigail’s best interest for Ex-Husband
to have sole managing conservatorship of Abigail.  She based this on the Department’s
observations of Ex-Husband caring for Abigail throughout the case.  Moore said, “[Abigail] is happy.  She’s healthy.  She’s well-cared for.  He’s completely appropriate.  There has never been any concerns with him
not doing everything in his power to protect her and notifying the Department
of anything that he needs.”  Moore
believed Mother’s rights to Abigail should be terminated based on “[o]ngoing
drug use, ongoing behaviors, lack of completion of services and inappropriate
decision-making on her part.”  Mother
testified that she suffered from depression, yet she denied being on
medication.  DFPS closed a previous case
on Mother because she sought treatment for anxiety and bipolar disorder from
MHMR.  See In re K.W.,
No. 02-08-00162-CV, 2009 WL 417913, at *6 (Tex. App.—Fort Worth Feb. 19, 2009,
no pet.) (mem. op.) (“Despite Appellant's bipolar diagnosis, she did not take
medication and had not sought treatment from a mental health expert. This
evidence also tended to show a potential emotional and physical danger to the
children.”); In re E.A.W.S.,
No. 02-06-00031-CV, 2006 WL 3525367, at *11–12 (Tex. App.—Fort Worth Dec. 7,
2006, pet. denied) (mem. op.) (holding that mother's “instances of mental
instability and agitation, including threatening behavior and suicidal
ideation” supported termination); In re K.A.S., 131 S.W.3d 215, 226 (Tex. App.—Fort Worth 2004, pet. denied)
(discussing the emotional and physical danger of the mother's noncompliance in
taking medications for her bipolar disorder).

Moore
also testified, “[Maria] is very young. 
She’s not even two years old yet. 
She needs stability and, again, she needs permanency.  And the parents have not adequately shown
that they can provide a stable, safe, protective, drug-free environment for her.”  Further, Moore said, “[Maria] deserves to be
adopted.  She deserves to be raised by a
stable, loving environment that will always keep her safe and be looking out
for her best interest opposed to other people’s best interest.”  Moore was concerned that there would be
future issues with the parents if their rights were not terminated.

Based
on our review of the entire record, we hold that the jury could have reasonably
formed a firm conviction or belief that termination of the parent-child
relationship would be in the best interest of both children.  See
Tex. Fam. Code Ann. § 161.001; C.H., 89 S.W.3d at 28.  We overrule Father’s first issue and Mother’s
first and second issues.

Conclusion

Having
overruled Grandmother’s, Father’s, and Mother’s issues, we affirm the trial court’s
judgment.

 

LEE GABRIEL
JUSTICE

 

PANEL:  GARDNER, WALKER,
and GABRIEL, JJ.

 

DELIVERED:  November 8, 2012








 











[1]See
Tex. R. App. P. 47.4.





[2]We
use aliases for the children and their relatives throughout this opinion.  See
Tex. R. App. P. 9.8(b)(2).





[3]It
is unclear from the record how many cases DFPS has opened on the parents.  Father told First Steps in his chemical
dependency evaluation that this was his fourth case with DFPS.





[4]The
jury was not asked who should be granted managing conservatorship of
Abigail.  In the final order of
termination, the trial court granted Ex-Husband managing conservatorship of
Abigail.





[5]Grandmother
also argues that the Maroneys are not within three degrees of
consanguinity.  Consanguinity, however,
is relevant only to subsection (a) of the statute.  See
Tex. Fam. Code Ann. § 102.004(a) (allowing a grandparent “or another relative
of the child related within the third degree by consanguinity” to file an
original suit requesting managing conservatorship).  The Maroneys did not file an original suit
but intervened in the suit filed by DFPS.





[6]Father
was asked,

Q. Okay.  Were
there times that you were walking together when coming out of the building?

A. Yes.

Q. And why was that?

A. Because my daughter was there and I refused to just
walk away from her, you know.  Like, I
could put her in the car.





[7]Father
testified that he has an anxiety disorder that interferes with his memory.  He said that he was not currently on
medication for the disorder because of his methadone treatment.  He later testified that he did not think he
had ever been diagnosed with any kind of disorder.  He then testified that he had been on
Klonopin or Clozapin prescribed by his family doctor for anxiety before he met
Mother.  Dr. Foster testified that Father
tested as having very low anxiety scores. 
Dr. Foster said that no anxiety disorder was evident from Father’s test
results.